No. 18,171.

CITY OF TRINIDAD, ET AL. *v.* W. H. HAXBY, ET AL.
(315 P. [2d] 204)

Decided September 3, 1957.

Mr. MYLES P. TALLMADGE, Mr. ROBERT C. TALLMADGE, for plaintiffs in error.

Mr. ANTHONY F. ZARLENGO, Mr. WILLIAM A. BRYANS III, Mr. BRYANT O'DONNELL, for defendants in error.

*En Banc.*

MR. CHIEF JUSTICE MOORE delivered the opinion of the Court.

THIS is an action by the plaintiffs as taxpayers against the City of Trinidad to enjoin the issuance of bonds. We will refer to plaintiff in error as Trinidad and to defendants in error as plaintiffs. The action involves the

validity of a proposed bond issue authorized under the terms of ordinances adopted by the City of Trinidad. Plaintiffs as taxpayers of Trinidad filed their complaint in the district court, by which they sought to enjoin the city from all acts contemplated by the adoption of ordinances numbered 792, 793 and 794. They further sought to enjoin an election authorized by resolution of the city council in which the qualified electors of the city were to have expressed their approval or disapproval of the bond issue.

Upon trial to the court the issues of fact and law were found in favor of plaintiffs, and judgment entered as prayed for by them. Trinidad seeks review by writ of error.

Although several questions are thoroughly discussed by counsel in the briefs, at the oral argument it was agreed that the pertinent questions have been considerably narrowed by action of the legislature which followed the filing of briefs by counsel.

Our study of the record suggests that the answer to one controlling question will resolve the controversy, but before proceeding we direct attention to the matters of law and fact which give rise thereto.

Ordinance No. 792 is one adopting a plan for a proposed hospital. Ordinance No. 793 authorizes a hospital board and defines the duties of the members thereof. Neither of these ordinances has direct relation to the issues involved and will not be further mentioned except to say that they complete the program contemplated by Trinidad which plaintiffs sought to enjoin.

Ordinance No. 794 authorizes the issuance of revenue bonds of the City for the purpose of erecting and equipping a public hospital, nursing home and diagnostic center, and acquiring ground therefor in Trinidad. The pertinent portions of this ordinance are sections 5 and 10, as follows:

Section 5: "The City Council of said City covenants that so long as any of said bonds are outstanding, it will

transfer to the Hospital Bond and Interest Fund hereby created and established, all of the revenue of its Hospital after paying reasonable expenses of maintenance and operation and such part of its cigarette taxes, parking meter fees and unpledged revenues of its electric light and power system as will be sufficient promptly to pay the interest on and principal of said bonds as the same become due and payable, respectively, and to create the Reserve Fund herein mentioned. The owners and holders of said bonds shall have a first and prior lien on such revenues as shall be necessary to fulfill the requirements of this Ordinance."

Section 10: "All incidental costs and expenses incurred in connection with or incident to the operation and maintenance of the Hospital and the issuance of Bonds, as provided by this Ordinance, shall be paid exclusively from the revenues herein specified and in no event shall any such costs or expenses be paid out of or charged to the general funds or tax levies of said City, either directly, or indirectly."

It is stipulated that if the revenue bonds proposed to be issued under the foregoing sections are held to constitute a debt of the City of Trinidad, the amount thereof would exceed the constitutional debt limitation of 3% of the assessed valuation of the property in the City of Trinidad for the year in question.

The pertinent provision of the state constitution is found in Article XI, Section 8. This section places limitations upon the power of cities in the matter of municipal indebtedness. Among other things it is provided " * * * but the aggregate amount of debt so created, together with the debt existing at the time of such election, shall not at any time exceed three per cent of the valuation last aforesaid."

By statute C.R.S. 139-32-1 (1) the governing bodies in cities and towns have the power "to control the finances and property of the corporation."

It is argued by counsel for Trinidad that the bond

issue authorized by ordinance 794 creates no "debt" of Trinidad as that term is used in the Constitution; that the "special fund" doctrine announced in *Shields v. Loveland,* 74 Colo. 27, 218 Pac. 913, is applicable; and that obligations payable out of municipal revenues other than ad valorem taxes, do not constitute a debt of the municipality within the meaning of the constitutional prohibition here in question.

On behalf of plaintiffs it is argued that the securities referred to as "revenue bonds" to be issued under authority of the said ordinance, constitute a debt within the meaning of Section 8, Article XI of the state constitution, and if issued would be void.

Question to be Determined.

*Where an ordinance of a city authorizes the construction of a hospital, to finance which the city proposes to issue bonds with the provision that said bonds shall be paid exclusively from the revenues specified in the ordinance and in no event paid out of or charged to the general funds or "tax levies" of the city, and where a Hospital Bond and Interest Fund is created to retire said bonds, to which fund all net revenue from the operation of the hospital is allocated together with such part of the city's "cigarette taxes, parking meter fees and unpledged revenues of its electric light and power system as will be sufficient promptly to pay" the bonds and interest, and where the bond holders are given a first and prior lien on the funds thus allocated: Does the proposed bond issue create a "debt" of the city within the meaning of the constitutional provision prohibiting municipal debts in excess of 3% of the assessed valuation of property within the city?*

The question is answered in the affirmative. The "special fund" doctrine relied upon by counsel for Trinidad is established in this jurisdiction by several decisions of this court. A study of these opinions will disclose that the limitations, within which the doctrine has been held to warrant bond issues to finance municipal projects,

are well defined. A brief reference to some of these decisions will serve to point up these limitations, and we hope, put at rest any doubt that may exist with reference to the power of cities to invoke the "special fund" doctrine in the issuance of revenue bonds as a means of financing projects and facilities which municipal officers deem necessary and expedient in the public interest.

In *Shields v. Loveland*, supra, it was held that bonds, issued for financing the building of an electric light and power plant, which were to be paid off exclusively from the income obtained from the plant to be built, did not create a "debt" within the meaning of the constitutional provision involved.

The next occasion for the court to examine the "special fund" doctrine arose in the case of *Searle v. Town of Haxtun, et al.*, 84 Colo. 494, 271 Pac. 629. *Shields v. Loveland*, supra, was decided in 1923, and *Searle v. Town of Haxtun* in 1928. The facts in the Haxtun case were that the town owned its municipal electric light system and that it proposed to issue income bonds for the purpose of providing the necessary financing to make certain extensions and improvements to the plant and system. The City Council passed an ordinance authorizing the issuance of income bonds for this purpose. In a taxpayer's suit against the town, the court sustained the town and held that the income bonds proposed to be issued were not in violation of the debt limitation of the Colorado Constitution. Thus was extended the principle announced in the Shields case to permit the pledging of future revenue to be derived from the operation of a utility then owned by the municipality for the purpose of permitting the municipality to make additions and betterments to the existing plant and facilities.

The question was next considered in 1933 in *Reimer v. Town of Holyoke*, 93 Colo. 571, 27 P. (2d) 1032. From the opinion in that case we quote the following:

"It [the pledged revenue] came from a fund partly created by taxation, but if it came entirely from the past

income of the plant, it was equivalent to money raised by taxation because it took its place for all uses. It did not come from the income made possible by the new equipment. *If it was in the general fund of the town, it was there for the general uses for which tax revenues are applied and if taken from that fund, as here, its general use was lost to the town and could only be made up by taxation or revenue from some other source.* This was an impairment of the general municipal revenues, and any obligation paid or contracted to be paid, out of a fund that is the product of a tax levy is a debt within the purpose of the constitutional limitation. 'However, having reached the constitutional limit of indebtedness, a city cannot create a debt to be paid directly or indirectly, in whole or in part, from funds raised by taxation, *or from a fund which must be replenished by funds raised by taxation.'* "

The next case to come before this court involving the question was *In Re Senate Resolution No. 2,* 94 Colo. 101, 31 P. (2d) 325. In that matter the court held that the proposed issuance of securities to finance highways, where the principal and interest of the debentures were to be paid exclusively from excise taxes on gasoline, was prohibited by Sections 3 and 4, Article XI of the Colorado Constitution. These sections impose limitations similar to Section 8, Article XI, except that they apply to debts of the state rather than to those of a municipality. In reaching that decision the court said, inter alia:

"Since the purpose of Sec. 3 of Article XI is to prevent the pledging of revenues of future years, a statute which at the same time it creates a debt, creates the fund to pay it, and which fund would not be otherwise available for general purposes, is clearly outside the constitutional prohibition."

After stating the rule of the Shields case and the Searle case, the court goes on:

"In such cases the utility is paid for solely out of the

revenue it produces, or extensions and improvements (if for such the debt is contracted) are paid for out of the increased revenue which they produce. The Reimer case, supra, clarifies the others, holding any impairment of the general municipal revenues violates the prohibition, and that 'any obligation paid or contracted to be paid, out of a fund that is the product of a tax levy is a debt' within the purpose of the constitutional limitation.' "

Following the announcement of the opinion in the cause last above mentioned, an amendment to the state constitution was adopted (Section 18, Article X). Under the terms of this amendment excise taxes on motor fuel must be used "exclusively for the construction, maintenance and supervision of the public highways of the state." In *Johnson v. McDonald,* 97 Colo. 324, 49 P. (2d) 1017, all the cases above cited were reviewed at length. It was there held that revenue anticipation warrants to be paid out of taxes imposed upon motor fuel were valid obligations, which did not create a "debt" of the state within the constitutional limitations upon the power of the legislature to incur indebtedness. The opinion in that case directs attention to the fact that the recently adopted constitutional amendment removed excise taxes on motor fuel from availability for general state purposes, stating that: "The payment of the anticipation warrants out of the fund provided by the act can never place any burden on the revenues available for appropriation for general state purposes."

Three other cases have been decided which involved the question under consideration. They are: *Watrous v. Golden Chamber of Commerce,* 121 Colo. 521, 218 P. (2d) 498; *McNichols v. Denver,* 123 Colo. 132, 230 P. (2d) 591; and *Broadhead v. City & County of Denver,* 126 Colo. 119, 247 P. (2d) 140. There is nothing in any of these decisions which expressly or impliedly modifies or overrules the earlier decisions.

In the instant case an attempt is made to im-

pound city revenues which are now available to defray general operating expenses of the city, and to place those revenues in a special fund for the payment of bonds issued for the purpose of building a hospital. The hospital project is wholly disconnected from and unrelated to the activity which produces the revenue thus impounded. Revenue obtained from cigarette taxes, parking meters and the operation of a power and light facility cannot possibly be considered as a product or by-product of the operation of a hospital.

Limited solely to the point under discussion, and absent any question of power to build the proposed hospital, if the bonds in question were payable exclusively out of net revenues to be derived from the operation of the hospital, then the "special fund" doctrine contended for by Trinidad would be applicable.

We have not held in any case that the "special fund" doctrine permits a city to create unlimited obligations payable out of municipal revenues so long as those revenues are derived from a source other than ad valorem taxes. Such determination would deprive the taxpayer of any semblance of the protection afforded by the constitutional limitations placed upon the power of cities to contract indebtedness.

Counsel for Trinidad assert in their brief that the restrictive limitation contained in the Constitution "prevents municipalities from furnishing the many public improvements, works, projects and facilities which are demanded by their inhabitants. Hence, it has been necessary for cities and towns to invoke the 'special fund' doctrine and to issue revenue bonds to accomplish desired purposes. Thus it has been possible for cities and towns to exercise their statutory powers without incurring municipal debts by the issuance of general obligation bonds under said restrictive constitutional and statutory provisions."

The answer to this argument is that the very purpose of the constitutional provision under discussion was

to place a limitation upon the power of municipalities to contract debts in furnishing the many "projects and facilities which are demanded by their inhabitants."

In substance, the argument of Trinidad is that any and all municipal revenue derived from any source other than ad valorem taxes on property can be pledged for the payment of specific obligations contracted by the city, and that said obligations thus secured by first liens on specific revenues do not create "debts" within the meaning of the constitutional prohibition. It does not require the wisdom of Solomon to point out that if the provision be so construed it would be possible to pledge all revenue other than property taxes to financing "projects and facilities" which may, or may not, be demanded by the inhabitants of a city and that the property taxes would then be called upon to carry the full burden of general fund obligations. Such taxes, already burdensome, would soon become confiscatory.

■ If, however, the "project or facility" to be created produces all the revenue to be used in discharging the bonds issued to create the project, without recourse on the part of the bond holder to other revenues of the city, then the "special fund" doctrine is applicable. Under such circumstances the obligations evidenced by the "revenue bonds" are outside the constitutional limitation, and do not constitute a "debt" within the meaning thereof.

■ If the framers of the Constitution were unnecessarily restrictive in prescribing the constitutional limitation, which many believe was designed to protect the credit of the state and its political subdivisions from the improvident incurring of public debt, the remedy lies with the people who have the power to repeal the limitation at the polls.

The "special fund" doctrine as recognized by this court cannot be extended beyond its well-defined scope. We cannot sanction a resort to "special funds" and "revenue bonds" in order to accomplish a purpose which the Con-

stitution declares to be against public policy, and which it expressly forbids.

The judgment is affirmed.

MR. JUSTICE HALL and MR. JUSTICE DAY not participating.